UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
DAVID ROBLES,

                                    Petitioner,                    **ORDER ADOPTING**
                                                                  **REPORT & RECOMMENDATION**

                -against-

                                                                     09-CV-2636 (SLT)

JOHN LEMPKE, Superintendent,

                                  Respondent.
-----------------------------------------------------------------x
**TOWNES, United States District Judge:**

        On June 9, 2004, petitioner David Robles was convicted of three counts of attempted murder in the first degree and sixteen related offenses following a jury trial in New York Supreme Court, Queens County. He was sentenced to an aggregate prison term of forty years to life. On June 11, 2009, Robles timely commenced his pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting eleven separate bases for relief. The Court referred the matter to Magistrate Judge James Orenstein for a report and recommendation ("R&R"), and on September 9, 2011, Judge Orenstein recommended that the petition be denied. (Docket No. 35). On October 24, 2011, Robles – now represented by counsel – filed timely objections regarding grounds discussed in the R&R: (1) that the trial court failed to suppress the identification of Robles; and (2) that Robles received ineffective assistance of trial counsel. (Docket No. 39 ("Obj.")). By letter dated April 5, 2012, Robles submitted a pro se supplemental objection to the R&R. (Docket No. 44). For the reasons set forth below, the Court adopts the R&R and denies Robles' petition.

## I.   BACKGROUND

This case stems from a break-in that took place in the early morning hours of March 3, 2003, in a third-floor brownstone apartment in Queens, New York, in which brothers William and David Lavery were violently stabbed by two attackers. In the hospital several days later, police showed William Lavery only a photograph of Robles, whom Lavery identified as his second-floor neighbor and attacker. Robles ultimately provided written and videotaped statements in which he confessed to the attack as part of an agreement with the landlord to oust the brothers from the apartment to collect higher rent. The Court presumes familiarity with the detailed facts and procedural history of this case, as set out in Judge Orenstein's thorough R&R, and will include additional facts only as they become necessary to the consideration of Robles' objections.

## II.   DISCUSSION

### A.   Standard of Review

A district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); see also Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."). After performing this inquiry, the court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. Where no objection has been filed, however, the district court "need only satisfy itself that there is no clear error on the face of the record." Urena v. New York, 160 F. Supp. 2d 606, 609-10 (S.D.N.Y. 2001).

### B. Roble's Objections

Under the framework established by Congress in the Anti–Terrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 (1996), this Court may only grant habeas relief if a state court judgment is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In this case, Robles objects to Judge Orenstein's recommendation that this Court deny habeas relief due to (1) the trial court's failure to suppress the identification of Robles; and (2) ineffective assistance of trial counsel. (Obj. at 1). Respondent argues that two of Robles' ineffectiveness claims were not contained in the petition, but were raised "for the first time in the context of arguing that he was entitled to an evidentiary hearing . . . and during oral argument" before Judge Orenstein. (Docket No. 40 ("Resp.") at 2). Respondent otherwise rests on his previous filings and on the reasoning in the R&R without further addressing the merits. Robles notes in response that he was pro se when he filed his petition so that it deserves a liberal reading and that, in any event, his claims do encompass the ones now before the Court. (Docket No. 43). In light of Robles' initial pro se status and out of an abundance of caution, the Court will consider all of the claims for which Robles has filed objections.[1]

---

[1] By letter dated April 5, 2012, and against the wishes of his counsel, Robles has offered his own "information" regarding the "troubling lack of reliability in eyewitness identifications." (Docket No. 44). The Court has considered the letter, to the extent that it does not introduce evidence outside the record.

### 1. William Lavery's Identification

Robles contends that his conviction was obtained in violation of due process because William Lavery's identification of him at trial was tainted by a suggestive pre-trial display of a single photograph. (Obj. at 8-9).

The Supreme Court has made clear that "reliability is the linchpin in determining the admissibility of identification testimony." Manson v. Brathwaite, 432 U.S. 98, 114 (1977). The inquiry into reliability of eyewitness identifications follows a two-step process, such that the evidence will be admissible if "[1] the procedures were not suggestive or [2] the identification has independent reliability." Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001). In this case, all parties appear to concede – and this Court agrees – that the procedures were suggestive. See Wiggins v. Greiner, 132 Fed. Appx. 861, 865 (2d Cir. 2005) (noting that the Circuit has "consistently condemned the exhibition of a single photograph as a suggestive practice, and where no extenuating circumstances justify the procedure, as an unnecessarily suggestive one."). Accordingly, the Court will focus its attention on whether William Lavery's identification of Robles as his attacker was independently reliable. To conduct this inquiry, a court must consider the following factors in their totality:

> (1) a witness's opportunity to view a criminal during the crime, (2) the witness's degree of attention, (3) the accuracy of any prior description of the criminal by the witness, (4) the level of certainty demonstrated by the witness at the time of the confrontation, and (5) the length of time between the crime and the confrontation.

Id. at 864-65 (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)); see Raheem, 257 F.3d at 135 (noting that no one factor is dispositive). William Lavery testified that (1) he initially saw his attacker had "a shaved head and some facial hair," (TT 931)[2]; (2) the attacker's "face came

---

[2] "TT" refers to the trial transcript. "HT" refers to the pretrial suppression hearing held on October 31, 2003, December 9, 2003, and January 5, 2004. "RT" refers to the recommendation on the pretrial suppression motion.

up in the light" of the doorway "and I saw him to be David Robles," (TT 931); (3) the attacker was "[e]ight, ten feet [away] max," (TT 932); (4) nothing was between William Lavery and the attacker and nothing covered the attacker's face, (TT 932); and (5) when William Lavery attempted to hit his assailant with a lamp, they were only "three-and-half feet away" from each other and the lighting conditions were "[m]uch better" with "light coming from elsewhere in the apartment, and in the doorway," (TT 952-53). While William Lavery did not know Robles' name when he identified his assailant in the photo four days after the attack, (TT 1005), he testified that to get to his apartment he would sometimes pass by Robles "draped over the railing of the second floor," (TT 918), and that he saw Robles "[a] couple of times a week . . . either going out to work or coming home from work," (TT 980). Lavery said that he "would see [Robles and Manchuca] talking together, walking together," (TT 918), and that he conversed with Robles "once or twice" to ask if the landlord was home, (TT 919).

In his objections, Robles argues that Judge Orenstein "failed to address a crucial fact: the assailants were wearing masks during the attack." (Obj. at 10). Robles relies for this position entirely on one police record, an interview with David Lavery at the hospital on March 4, 2003, which notes that "Complainant heard his brother screaming for help, and managed to run to the other room and saw his brother getting stabbed by a tall male wearing a black mask, and dark clothing." (Mem. Opp. Ex. O). Detective Sergio Rivera read the same words from this report at the pretrial suppression hearing. (HT 17-18). When defense counsel addressed the issue on cross examination at trial, however, David Lavery said he could not tell whether either of the perpetrators was wearing a hat or mask. (TT 1169, 1170). Moreover, <u>William</u> Lavery is the

5

complainant who actually made the identification in question, and he did not indicate in either his police interview or on the stand that his assailant wore a mask.[3]

Robles nevertheless argues that this case is similar to United States v. Gambrill, in which the D.C. Circuit noted that it was unclear "whether either [victim] ever saw the attackers without their masks, or, if they did, for how long and at what proximity." 449 F.2d 1148, 1154 (D.C. Cir. 1971). Contrary to Robles' argument, this case is quite different. The female Gabrill victim was unable to select a defendant from a lineup six days after the attack and she only changed her mind after the exhibition of two single photographs and having seen the two defendants (whom she had viewed at the lineup) seated with defense counsel. Id. at 1158. Additionally, while the Gambrill victims had never before encountered their attackers, William Lavery knew Robles (though not his name) as his neighbor prior to the incident. Defense counsel thoroughly explored this area of testimony, whereby William Lavery conceded that he did not know the name at the time of the interview, (TT 1005), but also insisted he had an opportunity to see his attacker after pushing him to the doorway and then attempting to strike him with a lamp. (TT 1007).

In sum, addressing the relevant factors, William Lavery testified that he had two opportunities to view the perpetrator, whom he said wore no hat or mask; testified that although he was initially focused on keeping the knife way from his throat, (TT 1007), he later was able to turn his attention to the perpetrator's face; had seen Robles multiple times in the apartment building; told police it was his neighbor and where to find him; identified his attacker (without name) in the photograph to police days after the incident; and immediately identified Robles at trial. The Court is persuaded under the circumstances that William Lavery had a sufficient

---

[3] Indeed, trial counsel appears to have similarly conflated the statements by the Lavery brothers when she argued at the suppression hearing that "there is no evidence that David Lavery had any understanding of who my client was at all" – to which the court responded, "[t]here was no identification by David." (HT 98).

6

independent basis for identifying Robles, despite the suggestive procedures used by police, and this portion of his petition is denied.

### 2. Ineffective Assistance of Counsel

Robles' next objection is that his trial counsel was ineffective because she failed to (1) argue his confession should be suppressed under New York law; (2) introduce evidence showing that William Lavery's identification was unreliable; and (3) use or even read exculpatory material from the minutes of the landlord's grand jury testimony. (Obj. at 11). To prevail on an ineffective assistance of counsel claim, a petitioner must show that his counsel's "performance was deficient" and "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984). With regard to the first step in the inquiry, a petitioner's burden is a heavy one, as a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Raysor v. United States, 647 F.3d 491, 495 (2d Cir. 2011) (quoting Strickland, 466 U.S. at 689). Reasonableness is to be assessed "from counsel's perspective at the time of the alleged error and in light of all the circumstances." Id. (quoting Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)). With regard to prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. As the Supreme Court has recently noted, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010). "Even under de novo review, the standard for judging counsel's representation is a most deferential one." Harrington v. Richter, 131 S.Ct. 770, 788 (2011).

7

### a.     Confession

Robles contends that trial counsel was ineffective because she failed to argue at the pretrial hearing that his confession should be suppressed under, specifically, New York law. (Obj. at 13). As Judge Orenstein correctly noted, the "doubly deferential" standard set forth in 28 U.S.C. § 2254(d) applies, so that "[t]he question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable – a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (internal quotation marks omitted).

Three police officers testified at the suppression hearing. First, Det. Sergio Rivera testified that there was no direction to place Robles under arrest while at the hospital. (HT 24-25). Det. Rivera stated that Robles agreed to come back to the precinct for an interview, where he was taken to an interview room and was not handcuffed. (HT 26-27). On cross examination, Det. Rivera reiterated that he did not speak to Robles at the precinct, and was too busy with his work to observe whether Robles was given food, drink, or an opportunity to sleep. (HT 35). Defense counsel challenged Det. Rivera on several of his statements and asked whether he took keys from Robles, which he denied. (HT 36).

Second, Det. Joseph Defrancis testified on cross examination that he saw Robles in the precinct debriefing room, but had no conversation with him. (HT 53).

Third, Det. James Osorio testified on direct examination that his interview with Robles at the precinct began just after 12 p.m. on March 4. (HT 66). Robles said he was a crime victim, that after investigating a loud noise from upstairs, he climbed out on his own fire escape and a man coming down slashed his wrist and fled to the rear of the building. (HT 67). Det. Osorio arrested Robles at approximately 12:55 p.m. and read Robles his rights from the Miranda

warnings sheet, which Robles signed. (HT 68, 69). Det. Osorio thereafter gave Robles "a pen and some paper and he wrote out the statement in his own hand." (HT 70). Approximately two and one half hours later, Robles also made a videotaped statement. (HT 73). On cross examination, Det. Osorio admitted that he first met Robles at approximately 9 a.m. at the precinct, but did not take any notes on this first conversation with Robles and did not give Miranda warnings. (HT 85, 86, 87). He did not recall whether the door to the interview room was locked and said Robles did not mention a heart condition until sometime after 12 p.m. (HT 86, 87). Det. Osorio stated that he gave Machuca's statement to Robles at approximately 12:40 p.m. and allowed him to read it, but did not leave it with Robles while he wrote his own statement. (HT 88, 89). Det. Osorio admitted that he did not know whether Robles left the interview room at all between 9 a.m. and 1 p.m. (HT 89). Det. Osorio denied, however, that Robles asked for an attorney during their morning conversation. (HT 90). Finally, Det. Osorio testified that Robles made his videotaped statement at approximately 4:15 p.m., which suggested that Robles had been in the same room except for using the bathroom "more than once" from 9 a.m. until at least 4:30 p.m. (HT 91-92). Det. Osorio also admitted that Robles complained that he "did not like confined spaces." (HT 92).

Considering these facts, the state court found Robles' statements at the crime scene, hospital, and precinct prior to his arrest admissible without the need for Miranda warnings because he was not yet in custody. (RT 6-9). Finding the arrest lawful, the court also concluded that Robles had made a voluntary waiver of his constitutional rights prior to making his written and videotaped statements and that there was "no credible evidence in the record to indicate that the defendant was threatened to make a statement or that his will was overborne." (RT 11).

Robles objects, asserting that an argument under People v. Bethea, 67 N.Y.2d 364, 366 (1986) and People v. Chapple, 38 N.Y.2d 112, 115 (1975)[4] "would have been compelling given the evidence that Robles was subjected to custodial interrogation, that he began his confession before being given his Miranda warnings, and that there was no pronounced break in his confession after he was finally given Miranda warnings." (Obj. at 13). Yet, no such facts were established at the suppression hearing, and Judge Orenstein is correct that "[t]o the extent the police gave different testimony at Robles' trial, the fault does not lie with [defense counsel]." (R&R at 67). Presumably the only way to show that "Robles began his confession before being given his Miranda warnings, and then – without interruption – continued giving his confession," (Obj. at 14), would have been for Robles to testify at the hearing. Considering that Robles ultimately took the stand at trial to testify that his confession had been coerced, it was reasonable trial strategy for defense counsel not to call him during the suppression hearing, where he might have made inconsistent statements that could be used to impeach him later. (R&R at 69). See United States v. Jaswal, 47 F.3d 539, 543 (2d Cir. 1995) ("Prior inconsistent suppression hearing testimony may properly be used to impeach a defendant during trial."). Moreover, even if Robles' trial counsel had elicited facts during the hearing that the confession was a continuation of a pre-warning statement and the court had suppressed it, Robles has not shown a reasonable

---

[4] The New York Court of Appeals decision in Bethea reaffirmed the principle enunciated in Chapple governing the admissibility of statements as a result of continuous custodial interrogation. Under this principle, unless there is a "definite, pronounced break in the interrogation. . . the defendant may [not] be said to have returned, in effect, to the status of one who is not under the influence of questioning." Chapple, 38 N.Y.2d at 115. In this way, "New York law and federal law diverge on the admissibility of a suspect's inculpatory statements when they are made both before and after Miranda warnings, and New York law is more favorable for defendants." Vachet v. West, No. 04-CV-3515, 2005 WL 740640, at *5 (E.D.N.Y. Mar. 24, 2005). See also Missouri v. Seibert, 542 U.S. 600, 604 (2004) (holding that Miranda warnings given mid-interrogation, after defendant gives unwarned confession, are ineffective, so that confession repeated after warnings is inadmissible). Judge Orenstein properly addressed and denied Robles' request for a Seibert hearing in this case. (See R&R at 13-18).

probability that the outcome at trial would have been different, given the overwhelming evidence in this case.

### b. Identification

During the suppression hearing, defense counsel adduced evidence that William Lavery did not know Robles' name at the time of the incident or his interview days later and attempted to impeach him by asking about his initial comments to police about how dark it was in the room. (TT 1002). Nevertheless, Robles narrowly argues in his petition that defense counsel was ineffective because at the hearing she "failed to question any witnesses about the quality of Lavery's eyesight and whether or not he was wearing his glasses at the time of the attack." (Obj. at 15). Interestingly, Robles does not challenge Judge Orenstein's observation that the record is bereft of evidence indicating that William Lavery normally wore glasses or that he was not wearing them that night. (R&R at 74 n.27). In truth, Robles has provided no factual (or legal) basis for why trial counsel's asking such questions would have altered the outcome of the suppression hearing, much less the trial.

### c. Grand Jury Minutes

Well into Robles' trial, his counsel told the court that she had just been made aware – by notice from the landlord's attorney – that the landlord had "testified before the grand jury, and it's his attorney's recollection that in the grand jury he somewhat exonerated . . . either Danny Machuca or David Robles, so I feel I am entitled to those grand jury minutes." (TT at 1102). The prosecution ultimately decided to hand over the grand jury testimony without further argument. (TT 1166). Robles' trial counsel then stated: "I have not read these minutes yet, but don't believe it's necessary that I read them before the cross-examination." (TT 1166). It is

11

Robles' position that trial counsel was ineffective for "failing to use or even read" this material "in which [the landlord] denied that Robles was involved in the crime." (Obj. at 16).

In the available excerpts of the grand jury testimony,[5] the landlord states that he was coerced to confess that he made a plan with David Robles and another person to attack the two brothers, but that he "did not participate in any crime" and "I was told that I had to sign the papers and then do the video and then I could go home." (Mem. Opp. Ex. O, grand jury transcript, at 129). Nothing in the excerpts indicates the landlord made exculpatory statements regarding Robles that were not also part of his own self-serving recantation. On review, the state court found that the landlord would likely have refused to answer questions that would impact his own charges, and that even if he did "there was certainly a risk that during questioning at [Robles'] trial, [the landlord] might have inculpated [Robles] in an effort to exonerate himself." (Mem. Opp. Ex. Q, 440 Decision, at 8). This Court agrees with that assessment.

Moreover, even if trial counsel is to be faulted for not taking the time offered to read the minutes herself, to establish prejudice under Strickland's second prong, Robles must show more than "that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. That, he has not done. Indeed, Robles' current counsel conceded as much before Judge Orenstein:

> THE COURT: Particularly with that part of the issue, that the landlord, who is accused of having sent out your client to oust these people through the use of violence, makes a self-serving statement that happens to also necessarily exonerate your client. How far does that get you in terms of showing prejudice?
>
> MS. SMITH: I think at the very least it could be impeachment evidence for the officers.

---

[5] The full transcript of the grand jury testimony has not been made available. (See R&R at 44 n.20).

12

| | |
|---|---|
| THE COURT: | It could. What effect is that likely to have? |
| MS. SMITH: | I agree with you. I think of the three . . . perhaps that one standing alone would be most difficult to demonstrate prejudice for . . . . |
| THE COURT: | . . . But even in terms of looking at the totality of the circumstances . . . I am just not sure it is something that counsel would want to put into the mix in light of the other circumstantial evidence in the case. |
| MS. SMITH: | Right. I agree with you. I think under different circumstances you might be able to say there was a strategic decision which obviously is then not breached by Strickland. |

(Docket No. 34, Apr. 6, 2011, conf. at 21-23). In his objections, Robles similarly argues that "it was clearly unreasonable for [trial counsel] to not investigate any further," but fails to propose how this material could or should have been used to achieve a different outcome at trial. (Obj. at 17). The Court agrees with Judge Orenstein's reasoning that even if trial counsel was unreasonable for not reading the minutes herself (though she presumably was familiar with their content), her decision not to use them falls well within reasonable strategy, given the fact that the landlord, awaiting his own trial, would likely have refused to testify or might have implicated Robles to exonerate himself. (R&R at 81). In any case, Robles makes no effort in his objections to assert how trial counsel's "troubling" decisions regarding this "marginally" useful material, (Obj. at 16, 17), caused prejudice, so that this claim fails under Strickland's second prong.

### 3. Aggregate Prejudice

A court must also "analyze the cumulative effect of counsel's failure," Rosario v. Ercole, 601 F.3d 118, 142 (2d Cir. 2010), "consider[ing] these errors in the aggregate," Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001). The Court, as noted, is not persuaded of counsel's failure in this case. Even assuming, arguendo, that the identification and confession had been

13

suppressed and defense counsel had successfully admitted the grand jury testimony, Robles has not shown it is reasonably likely that the trial's outcome would have been different. The jury still would have heard evidence that Robles was the downstairs neighbor, that he had a bite wound in the same location William Lavery described biting his attacker, that another neighbor saw Manchuca standing in the kitchen covered with blood and Robles climbing through the window immediately after the attack, about the bloody items found in their room, about a bloody knife found in the backyard, and about a financial motive. Indeed, "[e]ven serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt." Lindstadt, 239 F.3d at 204 (collecting cases).

## III. CONCLUSION

For the reasons set forth above, the objections to the Report and Recommendation of Magistrate Judge Orenstein are overruled, the Report and Recommendation (Docket No. 35) is adopted in its entirety pursuant to 28 U.S.C. § 636(b)(1), and the petition for a writ of habeas corpus is denied. The Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253 because the petitioner has failed to make a substantial showing of the denial of a constitutional right. The Clerk of the Court is directed to enter judgment denying the petition and closing this case.

**SO ORDERED.**

s/ SLT

/SANDRA L. TOWNES
United States District Judge

Dated: November 14, 2012
Brooklyn, New York